HYOSUNG AMERICA, INC., Hyosung America, Inc., as Assignee of Orkid Tex, Inc., Plaintiff–Counter–Defendant–Appellant,

v.

SUMAGH TEXTILE CO., LTD., Defendant–Counter–Claimant–Appellee.

Docket No. 96–9408.

United States Court of Appeals, Second Circuit.

Argued May 20, 1997.

Decided Feb. 13, 1998.

Peter L. Simmons, New York City (Matthew Gluck, Jennifer L. Colyer, Deborah Simpson, Fried, Frank, Harris, Shriver & Jacobson, New York City, Harlan M. Lazarus, Lazarus & Lazarus, New York City, of counsel), for Plaintiff–Appellant.

Steven C. Bennett, New York City (Fredrick E. Sherman, Jones, Day, Reavis & Pogue, New York City, of counsel), for Defendant–Appellee.

Before: WALKER, McLAUGHLIN and PARKER, Circuit Judges.

PARKER, Circuit Judge:

## I. BACKGROUND

This dispute arose from the sale and purchase of textile fabric. Orkid Tex, Inc. ("Orkid"), a company engaged primarily in the purchase and sale of textile goods, ordered fabric from Sumagh Textile Co., Ltd. ("Sumagh"), a textile manufacturer and supplier, to satisfy customer purchase orders. Hyosung America, Inc. ("Hyosung") is Orkid's assignee in the transactions relevant to this case, pursuant to an Agreement dated January 24, 1991, which was extended by the parties on November 16, 1992 and October 14, 1993 (the "Agreement"). Hyosung, like Orkid, is primarily a textile merchant, but also performs financier services for certain textile transactions to which it is not a party.

Orkid and Hyosung had the following responsibilities under the Agreement. Orkid was responsible for finding customers who wanted to buy textile fabric, and suppliers who were able to satisfy the purchase orders. Orkid would obtain purchase orders for fabric from the purchasers and submit the purchase orders to Hyosung. Hyosung and its factor would review each purchase order, which was subject to full credit approval according to Hyosung's discretion. After approval of the purchase order by Hyosung and

receipt from Orkid of its order to the supplier, Hyosung arranged to open letters of credit for the benefit of the supplier of the goods. Separate Order Assignment and Confirmation Agreements between Orkid and Hyosung declared that a particular order was assigned to Hyosung. *Hyosung America, Inc. v. Sumagh Textile Co.*, No. 94 Civ. 0568, 1996 WL 499346, at *8 (S.D.N.Y.1996)(hereinafter "*Hyosung II* "). These transactions were essentially resale transactions, where fabric was sold to Orkid at one price and then billed to the purchaser at a higher price.

Hyosung was also responsible for arranging the shipping of the fabric to the customer, paying shipping expenses including duty and freight, and collecting payment for each shipment. After collecting payment from the customer, Hyosung remitted payment to Orkid, minus the cost of the goods plus a fixed fee for its services and any additional charges for interest on late payment or inland freight.

Orkid was responsible for obtaining any required import or export licenses, and for ensuring compliance with all laws and regulations governing the sale of the product. In addition, Orkid bore the risk of loss in the event of cancellation of a customer's purchase order.

Sometime between late 1992 and early 1993, Mervyn's, a department store chain, placed an order with San Moire, Inc. ("San Moire"), a clothing manufacturer, to produce garments constructed of fabric with a content of 65% rayon and 35% wool. San Moire, in turn, provided Orkid with a sample of the type of fabric it wanted and placed a series of purchase orders with Orkid. The purchase orders correctly stated the 65% rayon and 35% wool blend that San Moire required to comply with the specifications of Mervyn's. After Orkid and Sumagh (the fabric manufacturer) exchanged several memoranda regarding the quality, blend, and price of the fabric Sumagh could provide, Sumagh agreed to provide the fabric for the San Moire purchase orders. Thereafter, San Moire purchase orders were handled in accordance with the Orkid–Hyosung Agreement.

In June 1993, Orkid made the first delivery of fabric to San Moire, which San Moire

accepted. San Moire sent samples of the fabric to Mervyn's. Mervyn's approved the fabric. In July 27, 1993, Orkid sent Sumagh a memorandum confirming that Orkid was satisfied with the quality of the fabric, and requested that Sumagh continue to send the same quality. However, on September 30, 1993, San Moire sent a letter to Hyosung and Orkid stating that there was a problem with the content of the fabric and that all outstanding invoices would not be paid until the problem was resolved. The problem was that the fabric Sumagh supplied contained no more than 30% wool whereas San Moire had specified 35% wool content. On October 4, 1993, Mervyn's sent a letter to San Moire in which it rejected "the entire shipment of rayon/wool merchandise" sent by San Moire because the fabric content was not the proper blend. (3(g) Stmt. ¶ 114). After October 4, 1993, San Moire continued to produce garments from the fabric received from Orkid and refused to return any of the fabric or to pay Hyosung for it.

Acting both in its own behalf and as the assignee of Orkid, Hyosung sued Sumagh for compensatory and punitive damages, alleging breach of warranty, breach of contract, fraud, and violation of both the Lanham Act and the Wool Products Labeling Act. Sumagh asserted counterclaims against Hyosung for breach of contract, seeking relief pursuant to the New York Uniform Commercial Code, quantum meruit, and unjust enrichment. Sumagh moved for summary judgment on Hyosung's claims.

In an Opinion and Order dated April 19, 1996, the district court granted Sumagh's motion and dismissed Hyosung's claims in their entirety. Specifically, the court dismissed the claims arising solely from Orkid's relationship with Sumagh (later assigned to Hyosung) on the basis that Orkid knew that Sumagh's shipment of fabric was non-conforming, and that the knowledge of Orkid, as assignor, must be attributed to Hyosung, as its assignee. *Hyosung America, Inc. v. Sumagh Textile Co.*, 934 F.Supp. 570, 575–78 (S.D.N.Y.1996) (hereinafter *"Hyosung I "*). The trial court also dismissed Hyosung's independent claim that Sumagh fraudulently caused it to issue letters of credit because the court found that Hyosung could not have reasonably relied on any misrepresentations made by Sumagh. *Id.* at 575, 578–79. The claims under the Lanham Act and the Wool Products Labeling Act are not a subject of this appeal.

Following a bench trial on the counterclaim issues, the district court entered judgment on September 20, 1996 and awarded a money judgment in favor of Sumagh. *See Hyosung II*, 1996 WL 499346, at *13. This appeal followed.

We affirm the dismissal of Hyosung's breach of warranty and breach of contract claims for substantially the same reasons as stated in the district court opinion. We also affirm the district court's judgment on Sumagh's counterclaims. We reverse, however, the dismissal of the fraud claim because there are material issues of fact concerning whether Hyosung could have, and in fact did, reasonably rely on any misrepresentations Sumagh made. Accordingly, this opinion deals only with Hyosung's fraud claim.

## II. DISCUSSION

### A. *Standard of Review*

We review the district court's grant of summary judgment *de novo*. *See Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1535 (2d Cir.1997). Summary judgment is appropriate when there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In examining this question, the court should resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). "[S]ummary judgment will not lie if . . . the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

## B. *Hyosung's Fraud Claim*

 The Agreement provides that disputes arising thereunder shall be governed by the laws of the state of New York. "Under New York law, the essential elements of a common law fraud claim include 'a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff.'" *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir.1994) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)).

Hyosung claims that Sumagh delivered non-conforming fabric and created documents which falsely represented the fabric blend for the purpose of fraudulently drawing against the letters of credit opened by Hyosung. Hyosung maintains that it was ignorant of the fraud until after it accepted delivery of the fabric. Concluding that Hyosung could not have reasonably relied on any misrepresentations Sumagh made, the district court granted summary judgment in favor of Sumagh. *Hyosung I*, 934 F.Supp. at 575, 578–79. Specifically, the court determined that Hyosung had the ability to discover the non-conforming fabric, but "failed to make use of information available to it." *Id.* at 579. For instance, Hyosung could have asserted its right under the Agreement to receive "all details" relating to the purchases by examining Orkid's documentation, which would have revealed correspondence between Orkid and Sumagh that indicated "Orkid specifically instructed Sumagh to mislabel its goods and purchase orders to reflect the [proper] fiber content." *Id.* at 577, 579. Additionally, Hyosung could have insisted on written assurances, or "that Orkid provide laboratory test results confirming that the fiber content of the fabric it received was correct." *Id.* at 579.

The district court found that such additional measures would have been appropriate because "Hyosung [also] had frequent disputes with Orkid" concerning customer complaints and had insisted on written assurances in the past. The court also found that "Hyosung was critically interested in details concerning Orkid's supply arrangements" and "was in frequent communication with Orkid," perhaps owing to their history of disputes. *Id.* Accordingly, Hyosung could not reasonably rely on Sumagh's representations without taking extra measures to protect itself.

The court also found that Hyosung was on notice to implement such measures because on May 14, 1993, before the first shipment of fabric, Orkid sent notification to Hyosung that it was "facing a lot of claims and cancellations from [its] customers" because U.S. customs refused to release merchandise due to certain problems relating to the accompanying paperwork. Orkid described these errors as pertaining to the "full description of the goods, wrong visa, wrong conversion to sq/m, cartons and tags wrongly marked, and not matching documents etc...." *Id.*

The district court concluded that Hyosung's reliance was unreasonable as a matter of law. We disagree. A reasonable jury could conclude that Hyosung was not put on notice to review Orkid's files and that, even if on notice, such a review would not have discovered the problem.

It has been held that where a plaintiff "'has the means of knowing, by the means of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations,'" *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80–81 (2d Cir.1980) (quoting *Schumaker v. Mather*, 133 N.Y. 590, 596, 30 N.E. 755, 757 (N.Y.1892)), and that justifiable reliance will not be found in "cases in which plaintiff was placed on guard or practically faced with the facts," *id.* at 81. We do not believe that Hyosung was "placed on guard or practically faced with the facts" as a matter of law, or that Hyosung had the means to become aware of the facts by such "ordinary" measures.

We have also previously held that "'[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'" *Keywell Corp. v. Weinstein,*

33 F.3d 159, 164 (2d Cir.1994) (quoting *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 737 (2d Cir. 1984)). However, in the absence of a showing that the "plaintiff was placed on guard or practically faced with the facts," that principle is more relevant in cases, like *Grumman Allied Industries* and *Keywell,* that involve the purchase of a business. In such cases, the "critical information" relating to the misrepresentation is often more discoverable "by the means of ordinary intelligence" through the performance of due diligence. Here, the duty to inquire was more remote and depended on notice.

Although we did not find reasonable reliance in *Grumman Allied Industries,* in *Keywell* we declined to affirm summary judgment dismissal of a fraud claim on facts providing a stronger argument for lack of justifiable reliance than in the case at bar. In that case we held that the purchaser of a metal recycling plant was entitled to rely on representations made by a defendant that the land was free of hazardous waste. We made this determination despite the fact that an environmental audit noted possible groundwater contamination, and that the purchaser had access to files containing information about the seller's discovery of buried hazardous waste material. We held that because the purchaser was not "placed on guard or practically faced with the facts," the purchaser's reliance was not unreasonable as a matter of law. *Id.* at 164. Hyosung was confronted with even less notice, and therefore dismissal as a matter of law was likewise improper here.

First, the "notice" relating to the customs problems does not appear to be relevant to the issue of fabric content. The meaning of the notice is open to several interpretations. The discrepancies pertaining to the "full description of goods" and "not matching documents" *could* imply that certain items were falsely represented in the customs or delivery documents. However, it is highly unlikely that a 5% variance in the composition of fabric could so easily be detected. Nevertheless, while notice of such problems *might*

constitute notice of prior fraudulent acts, it could also more likely refer to paperwork that was incorrectly completed in some administrative respect, or in error matched to the wrong merchandise. Whether Orkid's correspondence constitutes sufficient notice is a determination for the fact finder, at trial.

Furthermore, the reasons noted by the district court that may have required Hyosung to be wary all relate to concerns Hyosung should possibly have had about Orkid. Therefore, the court's conclusion that Hyosung could not reasonably rely on Sumagh's representations can only be justified on the theory that Hyosung should have been suspicious of Sumagh because of Sumagh's association with Orkid. A reasonable fact finder could conclude, however, that Hyosung's concerns about Orkid would not necessarily compel Hyosung to take extra precautions in dealing with Sumagh.

### C. *Sumagh's Counterclaims*

Sumagh's counterclaims primarily pertained to its failure to receive payment on a number of shipments to Orkid in fulfillment of five supply orders. The district court dismissed four of the claims and awarded judgment in favor of Sumagh with respect to one of the orders. The dismissals have not been appealed; therefore, we discuss the single counterclaim that was appealed.

We disagree with Hyosung that our reversal on Hyosung's fraud claims should bear on the district court's judgment on Sumagh's counterclaims. We address this point because the district court's opinion concerning the counterclaim is unreported. We explain why this determination is not inconsistent with Hyosung's potential to recover on its fraud claim.

Sumagh's counterclaim was based on its supply order with Orkid. Therefore, in order for its counterclaim against Hyosung to be successful, Sumagh was required to demonstrate that Hyosung assumed or was bound by Orkid's contractual obligations under the supply order.[1]

---

1. In order to recover on a contract for the sale of goods, an aggrieved seller must show that: a) it

had a contract; b) the buyer failed to pay the purchase price; c) the goods sued on are "identi-

■ We agree with the district court's conclusion that Orkid's contract with Sumagh was assigned to Hyosung by virtue of the Agreement between Hyosung and Orkid.[2] *Hyosung II*, 1996 WL 499346, at *7. By accepting the assignment of Orkid's rights and interests in the underlying contract, Hyosung also assumed Orkid's duty to perform under the contract.[3]

■ On July 21, 1993, Orkid sent Sumagh supply order 1736, which was later amended to call for 38,800 square yards of fabric at a purchase price of $3.10 per square yard. The supply order was assigned to Hyosung, which arranged to open a letter of credit for the benefit of Hyosung. On August 14 and 31, and September 6, 1993, Sumagh sent partial shipments to Hyosung pursuant to the supply order. Hyosung accepted and paid for these shipments. Subsequent shipments sent by Sumagh, totalling 5,632 square yards of fabric, were also accepted by Hyosung, but Hyosung refused to pay for them because it had become aware of the improper fabric content. The district court stated:

> Generally, a buyer "must pay at the contract rate for any goods accepted." N.Y. U.C.C. § 2–607(1). Acceptance occurs where "after a reasonable opportunity to inspect the goods," the buyer "signifies to the seller that the goods are conforming or that he will take [...] them in spite of their non-conformity." N.Y. U.C.C. § 2–606(1)(a).

*Hyosung II*, 1996 WL 499346, at *10.

Although it is undisputed that the fabric did not conform to the requirements specified by San Moire, Hyosung failed to properly reject the goods. The court held:

fiable to the contract" and [d)] it was unable to resell the goods after reasonable effort. *See* N.Y. U.C.C. §§ 2–201, 2–709 (McKinney 1993).

2. The court properly rejected Sumagh's alternate theories that Orkid was acting as Hyosung's agent when it executed the contracts with Sumagh, or that Hyosung later ratified Orkid's contracts with Sumagh. *Hyosung II*, 1996 WL 499346, at *4.

3. In coming to this conclusion, the district court considered § 2–210(4) of the Uniform Commercial Code which distinguishes "between a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and

Rejection of goods must be made within a reasonable time. N.Y. U.C.C. § 2–602(1). After rejection, "any exercise of ownership by the buyer" is "wrongful." N.Y. U.C.C. § 2–602(2)(a). A buyer must follow instructions from the seller or sell goods "for the seller's account" once the goods have been rejected. N.Y. U.C.C. § 2–603(1). Here, Hyosung never returned the allegedly rejected fabric; nor did it attempt to resell the goods once they had been rejected.

*Id.* at *11.

■ The court also stated that the incremental deliveries under supply order 1736 came under § 2–208(1) of the Uniform Commercial Code, which provides that where a "contract for sales involves repeated occasions for performance" by one party with the "opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection" with regard to the earlier shipments, "shall be relevant to determine the meaning of the agreement." N.Y. U.C.C. § 2–208(1). *Id.* Therefore, because Hyosung accepted the three shipments sent between August 14 and September 14, 1993 without objection, it acquiesced in accepting future shipments of the same nonconforming fabric because those later shipments were also accepted without objection. Hyosung's refusal to pay for the later shipments, in itself, was not a proper objection in light of the fact that it accepted the fabric.

■ Accordingly, we affirm the court's award to Sumagh of money damages and prejudgment interest with respect to supply order 1736. To calculate the damages, the district court determined that:

duties, and a financing assignment in which only the assignor's rights are transferred." N.Y. U.C.C. § 2–210, Official Comment 5.

The court examined the evidence in the record related to "the business activities, the objectives and the relationship of the parties to ascertain [their] intent," *In re Candy Lane Corp.*, 38 B.R. 571, 576–77 (Bkrtcy.S.D.N.Y.1984) (internal quotation omitted), and concluded that the transactions in question amounted to more than a mere financing arrangement, and that Hyosung failed to sustain its burden to show by clear and convincing proof that only a security interest was intended, *Id.* at 577 (citing *Cross v. A.G.V. Associates, Inc.*, 340 F.2d 42, 44 (2d Cir.1964)). *Hyosung II*, 1996 WL 499346, at *7.

where a buyer "wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery," a seller may recover: (1) the contract price of the goods (if the goods have not been resold), N.Y. U.C.C. § 2–709; or (2) the difference between the contract price and the resale price (if the goods have been resold). N.Y. U.C.C. §§ 2–703, 2–706. If the goods are resold "at any time prior to the collection of the judgment," the net proceeds of resale will be credited to the buyer. N.Y. U.C.C. § 2–709(2).

*Hyosung II*, 1996 WL 499346, at *11.

Here, there is no evidence that the goods were resold. Accordingly, the court properly found that pursuant to § 2–709(2), Hyosung is liable for $17,459.20, the contract price of the fabric.

The court also correctly awarded prejudgment interest. New York law provides that:

Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y. C.P.L.R. § 5001(a) (McKinney 1992).

■ Interest is calculated from the date damages were incurred. *Id.* § 5001(b). The shipments pertaining to supply order 1736 were invoiced between September 15 and October 15, 1993. Pursuant to the terms of the Agreement between Hyosung and Orkid, Hyosung was required to collect payment from San Moire within sixty days after the date of invoice, and in turn remit payment to Orkid within two weeks after receiving such payment.

Accordingly, Orkid should have received payment no later than December 28, 1993. Consequently, the district court properly assessed and awarded prejudgment interest at an annual rate of 9% as of that date, thereby adding $4,303.69 to the judgment for a total of $21,762.89. *Hyosung II*, 1996 WL 499346, at *13.

The district court's analysis establishes that Hyosung assumed a contractual obligation concerning supply order 1736. By the time Hyosung received the later shipments under the supply order, it had become aware that the fabric did not conform to the specifications required by San Moire's purchase order. Therefore, it was incumbent upon Hyosung to make a proper rejection of the shipments in order to avoid liability for the goods.

■ Accordingly, contrary to Hyosung's assertion, our decision regarding Hyosung's potential to recover on its fraud claim does not implicate Hyosung's duty to perform the contracts it assumed from Orkid, and does not constitute grounds for reversal.

## III. CONCLUSION

We affirm the dismissal of Hyosung's claims with the exception of its fraud claim against Sumagh. Because we conclude that there are disputed material issues of fact that preclude summary judgment with respect to Hyosung's fraud claim, we reverse the dismissal of that claim and remand to the district court for further proceedings. For the reasons stated above, we also affirm the district court's judgment on Sumagh's counterclaim.